IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ILLINOIS NATIONAL INSURANCE COMPANY, et al., | )<br>)<br>) |
| Plaintiffs, | )<br>) No. 17 C 7567<br>) |
| v. | ) Judge Virginia M. Kendall<br>) |
| ACE STAMPING AND MACHINE CO. INC., | )<br>)<br>) |
| Defendant. | )<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

General Electric Transportation ("GET") manufactures locomotive engines and uses various washers in those engines. In 2015–2016, GET retained Optimas OE Solutions, LLC ("Optimas") to source the washers from outside vendors to use in its engines. When GET began manufacturing the engines, the washers cracked, and upon inspection, GET determined that the washers were not flat and were brittle. As a result, GET dissembled the locomotive engines and rebuilt them with different washers incurring approximately $1.7 million in losses. GET made a demand to Optimas, the supplier of the washers for the loss. Optimas was not the manufacturer of the washers; but rather, the supplier. Optimas had contracted with manufacturer Ace Stamping and Machine Co. Inc. ("Ace") to provide the washers to Optimas's customers. When GET complained about the defective washers supplied to them, Optimas settled with GET and the Plaintiff-Insurers reimbursed it for that

settlement. Plaintiffs now move for summary judgment against Ace, the alleged manufacturer of the washers, alleging that Ace is required to indemnify them for the settlement cost pursuant to an agreement. While the purely legal issue of contract interpretation as to the indemnification clause is decided in favor of Plaintiffs, Plaintiffs' Motion for Summary Judgment is otherwise denied due to remaining disputes of material facts.

## BACKGROUND

Dating back to at least January 2015, GET retained Optimas[1] to source two types of washers used in the manufacture of locomotive engines—washer types 41B537660P11 ("P11") and 41B537660P16 ("P16"). (Dkt 43 ¶ 7). Optimas sourced the washers from outside manufacturers. Optimas had previously sourced the washers from manufacturer Andre Armor. (Dkt. 54 ¶). But due to financial difficulties Andre Armor was experiencing, Optimas began sourcing P11 and P16 washers from Ace. (Dkt 43 ¶ 10). From July 2015 through March 2016, Ace was Optimas's sole supplier of P11 and P16 washers. (*Id.* ¶ 10; Dkt. 43-1 ¶ 15). Beginning in August 2015, Optimas sent the P11 and P16 washers it had received from Ace to GET and did so without any alteration to the washers. (Dkt 43 ¶ 12).

Optimas included the following paragraphs in its Terms and Conditions of Purchase, which it included with the purchase orders it sent to Ace:

> 1. Any order placed or purchase order issued by Buyer (an "Order") for products and/or services described therein (collectively, the "Products") is subject to this Agreement, together with any additional or different terms mutually agreed to in writing by Buyer. Acceptance of an Order

---

[1] Prior to June 2015, Optimas was known as Anixter OEM Supply Fasteners. This opinion refers to both Optimas and Anixter as "Optimas." (Dkt. 43 ¶ 8).

by Seller will occur upon the happening of any of the following: (i) receipt by Buyer from Seller of written acceptance of an Order or written notice that Seller will provide the Products. . . and (iii) any other conduct of Seller which recognizes the existence of a contract pertaining to the Products. . . .

. . .

9. Seller warrants that the Products will conform to the specifications, drawings, samples or other description furnished to Seller; will be of new manufacture and free from defects in material and workmanship; will be free and clear of all liens and encumbrances; and will comply with all other warranties implied in fact or by law. Such warranties shall run to Buyer and its customers and shall continue in full force and effect and Seller shall not be relieved of such warranties by Buyer's inspection of or payment for the Products. . . .

. . .

10. Seller will defend, indemnify and hold harmless Buyer, its directors, affiliates, employees, and agents from and against any and all claims alleging. . . (ii) property damage, injuries or death to persons, or any other damage, loss cost or expense (including judgments paid and attorneys' fees and expenses reasonably incurred) arising out of the purchase, use or operation of any Products. . . .

(Dkt. 43-2; Dkt. 43-3).

Ace admits that it sent acknowledgments for these purchase orders and that it did not object to the inclusion of the indemnity clause in the terms and conditions. (Dkt. 43-4 at 14; Dkt. 49 ¶¶ 26–27, 31–32, 36–37, 41–42, 46–47, 51–52, 56–57). Ace argues, however, that with its shipments it included packing slips containing a remedy limitation which modified the agreement between the parties. (Dkt. 50 at 3). Those packing slips stated that "Liability of Seller for goods found to be defective or not in accordance with agreed specifications, shall be limited to replacement of goods or refund of the purchase price, as the Seller shall select." (Dkt. 49-7).

In November 2015 and March 2016, GET discovered that washers were cracking during the assembly of locomotive engines. (Dkt. 43 ¶ 58; Dkt. 54 ¶ 17). GET attributed the issues to Optimas, as Optimas was the supplier of washers at the relevant facility. (Dkt. 43-12 at 28:6–14). GET's Senior Commodity Manager, Jonathan Merriott, testified that an analysis indicated that the washers supplied by Optimas had not been tempered properly and therefore had not adequately hardened. (*Id.* at 34:5–36:11). As a result, the washers "became more brittle and can crack when not flat." (*Id.* at 36:8–11). The washers were also defective because they were not flat. (*Id.* at 48:19–22). GET determined that the defective washers were attributable to Optimas, rather than another supplier, Gexpro. (*Id.* at 109:15–23).

GET could not use or sell locomotives with the defective components. (*Id.* at 31:5–17). As a result, on May 3, 2016, GET sent a demand letter to Optimas detailing the $1,575,485.70 in costs it had incurred due to the defective P11 and P16 washers Optimas supplied. (Dkt. 43 ¶ 68; Dkt. 43-16). On June 1, 2016, GET followed up with a letter from its Chief Financial Officer – Supply Chain confirming these costs. (Dkt. 43 ¶ 70).

On May 11, 2016, Optimas sent a letter to Ace notifying it of GET's claim, stating that it expected "that Ace will honor its agreement and warranty, and submit full payment of these amounts immediately." Optimas went on to state that it was "in the process of gathering further information regarding the exact amount of these damages" and that it would forward additional information when it became available. (Dkt. 43-19).

Ultimately, on June 24, 2016, Optimas paid a total of $1,704,003.84 to settle with GET, of which $1,575,485.70 was due to the defective P11 and P16 washers. (Dkt. 49 ¶ 74; Dkt. 53 at 11). Illinois National Insurance Company and Zurich American Insurance Company each reimbursed Optimas $600,000 for the settlement with GET. (Dkt. 43 ¶¶ 75–76).

## **LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether a genuine issue of fact exists, the Court must take the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018).

## **DISCUSSION**

**A. Indemnification Clause**

Plaintiffs allege that Ace contracted to indemnify Optimas against claims arising from the use of Ace washers. (Dkt. 42 at 9). Optimas cites the following provision, which it included in its terms and conditions along with its purchase orders:

> 10. Seller will defend, indemnify and hold harmless Buyer, its directors, affiliates, employees, and agents from and against any and all claims alleging. . . (ii) property damage, injuries or death to persons, or any other damage, loss cost or expense (including judgments paid and attorneys' fees and expenses reasonably incurred) arising out of the purchase, use or operation of any Products. . . .

(Dkt. 43-2; Dkt. 43-3). Optimas's terms and conditions also provided that its purchases would be subject to the terms and conditions, along with "any additional or different terms mutually agreed to in writing by Buyer." (Dkt. 43-2; Dkt. 43-3). The terms provided that "receipt by Buyer from Seller of written acceptance of an Order or written notice that Seller will provide the Products" or "any other conduct of Seller which recognizes the existence of a contract pertaining to the Products" would constitute Ace's acceptance. (Dkt. 43-2; Dkt. 43-3).

Ace has pointed to no evidence refuting that Optimas sent purchase orders containing the terms and conditions and that Ace sent acknowledgments for those orders. Ace, though, disputes that it is bound by the indemnification provision, instead arguing that its packing slips contained a remedy different from the original agreement and these packing slips limited its damages thereby modifying the agreement. (Dkt. 50 at 3). The problem with Ace's position is that Ace asserts that merely by accepting the orders with the packing slips, the parties modified their agreement, without recognizing that the purchase orders contained the terms and conditions and Ace acknowledged those purchase orders.

Under Illinois law, "[a] definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered

or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." 810 ILCS 5/2-207. Here, Ace's order acknowledgments served as written confirmation that Ace would provide the products and therefore constituted an acceptance. *See, e.g., Outboard Marine Corp. v. Babcock Ind., Inc.*, No. 91 C 7247, 1994 WL 468596, at *5 (N.D. Ill. Aug. 26, 1994) (concluding that an order acknowledgment served as an acceptance where it did not put express conditions on acceptance). The acknowledgments contained no supplemental or inconsistent terms, and so they are interpreted as accepting Optimas's terms and conditions, including the indemnification provision. *See Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 295 (7th Cir. 2002) (noting that an acceptance containing "neither supplemental nor inconsistent term[s]. . . is effective to make a contract").

Additionally, one of Optimas's terms and conditions, which Ace is deemed to have accepted, limited modifications except as agreed to in writing. Yet the remedy limitation in the packing slips was not agreed to in writing by Optimas. *See, e.g., Canadian Pac. Ry. Co. v. Williams-Hayward Protective* Coatings, Inc., No. 02 C 8800, 2005 WL 782698, at *19 n.4 (N.D. Ill. Apr. 6, 2005) (rejecting a party's attempts to add additional terms to a contract after formation). It therefore was not an effective modification under the prevailing contract terms.

Ace attempts to argue that the packing slips did modify the contract. Ace points to *Intrastate Piping & Controls, Inc. v. Robert-James Sales, Inc.*, 733 N.E.2d 718, 723 (Ill. App. Ct. 2000), which provides that "a remedy limitation which provokes no objection becomes a part of the contract." *Intrastate Piping* itself, however,

provides grounds to distinguish the instant case, as the court there noted that the outcome may have been different if the remedy limitation "appeared only when the goods were shipped, long after the parties entered into their contract," which is exactly what happened here. *Id.* Ace's shipments and packing slips were often sent many months after the initial purchase orders. (Dkt. 49-7*). See e.g., Illinois Wholesale Cash Register, Inc. v. PCG Trading, LLC*, No. 0 8C 363, 2008 WL 4924817, at *6 (N.D. Ill. Nov. 13, 2008) ("The [later] Invoice upon which defendant relies was sent after the parties had already entered into a contract and can only be viewed as a proposal to modify the terms of the contract, to which plaintiff did not agree.")*; cf. S. Illinois Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co.*, 302 F.3d 667, 669 (7th Cir. 2002) (remedy limitation was provided on same day of order). Ace's argument therefore fails; the packing slips did not suffice to modify the contract and thus were not valid remedy limitations.

### B. Duty to Defend

Accepting that the indemnity provision is valid and can be enforced against Ace, issues of fact remain. Plaintiffs argue that because Optimas tendered the defense of GET's claim to Ace and Ace refused defend the claim, Optimas was entitled to settle the claim and Ace cannot now dispute the merits of that settlement or whether Optimas was, in fact, liable to GET. This argument is based on Illinois law, which provides that when an indemnitor has the opportunity to defend but refuses to do so, "the indemnitor is precluded from thereafter asserting the non-liability of the defendant to the plaintiff in the principal action as a means of avoiding liability for

indemnification." *N. E. Finch Co. v. R. C. Mahon Co.*, 370 N.E.2d 160, 163 (Ill. App. Ct. 1977).

As described above, Optimas notified Ace that GET had made a demand on May 11, 2016. Ace responded on June 28, 2016, disputing liability. (Dkt. 49-17). It does not appear, however, that by that time Optimas had actually sent GET's demand to Ace. (Dkt. 49-17). In the meantime, without waiting for a response from Ace, Optimas settled with GET on June 24, 2016. Optimas has not pointed to evidence that it made Ace aware that it was engaging in settlement talks with GET.

Optimas told Ace in the initial communication that it was "in the process of gathering further information regarding the exact amount of these damages" and that it would forward additional information when it became available, but it does not appear that Optimas did so. (Dkt. 43-19). Further, Ace has alleged that it was attempting to work with Optimas at the time, but Optimas did not provide Ace with a reasonable opportunity to inspect the allegedly defective washers. (Dkt. 54 ¶ 33).

Nor is it clear, from the evidence available, that Ace should have known at the time that its duty to indemnify had conclusively been triggered. Optimas's terms and conditions indemnify Optimas against a claim alleging damages arising from the use of Ace's products. There is some evidence that internally, GET was attributing the defective washers to Ace. (Dkt. 43:14–44:14). Yet, as Ace points out, GET's demand letters to Optimas did not identify the defective washers as Ace washers, it only identified that they were Optimas's washers. (Dkt. 49 ¶ 68).

Optimas, at this point, has failed to establish that Ace refused to defend the claim prior to settlement. Optimas has therefore presented insufficient facts to establish that Ace is barred from disputing the merits of the underlying claim between Optimas and GET.

Optimas argues that Ace has already admitted that its washers were the defective washers. Again, Ace disputes this. Optimas alleges that Ace's corporate representative, Robb Ehrhart, confirmed that Ace washers did not meet requirements. Mr. Ehrhart's testimony is not dispositive. He testified as follows:

> Q: The ultimate P16 washers provided to Optimas in response to the Optimas purchase orders did not, in fact, all comply with the specifications for those parts that we previously looked at. Correct?
>
> A: I have to believe that is the case. Otherwise, I don't think I'd be sitting here today.
>
> Q: That applies to P11, too. Right?
>
> A: Yes.
>
> Q: You agree with me that in the 8D reports we just looked at, Ace and FPM itself acknowledged that the parts did not meet the flatness and hardness requirements as specified in the PPAP process. Correct?
>
> A: It appears that way, yes.

(Dkt. 43-15 at 57:13–58:4). This testimony appears to reflect Mr. Ehrhart's understanding that because he is in litigation, some error must have occurred. It does not reflect firsthand knowledge that the Ace washers were defective and cannot be relied on for this proposition. Ace also disputes that the "8D reports" serve as an acknowledgment by Ace that its washers were defective. Ace responds that this was beyond Mr. Ehrhart's expertise, and that Mr. Ehrhart's testimony reflected only "his

interpretation regarding what the 8D report states" and that "the 8D report was meant to identify a problem perceived by the client (Optimas) and was not an acknowledgment by Ace that the washers did not meet the specifications." (Dkt. 49 ¶¶ 64–65). Ace also points to another of its corporate representatives, James Haarsma, disputing that the claim arose from Ace washers; Mr. Haarsma testified that he was aware that GET's demand arose from the sale of P11 and P16 washers, but was not aware of whether those washers were Ace's. (Dkt. 43-10 at 67:14–18).

Optimas turns again to Mr. Ehrhart, noting that he testified that it was "Correct" that "Ace acknowledged to Optimas in 2016 that the hardness also -- of the P11 and P16 parts exceeded the specifications identified in the PPAP process." (Dkt. 43-15 at 58:11–14). In response, Ace again points to the testimony of Mr. Haarsma, who testified that he had not seen a washer not meeting hardness requirements nor a report stating as much. (Dkt. 54 ¶ 30; Dkt. 49-2 at 36:2–16). The gap between Mr. Ehrhart's and Mr. Haarsma's testimony shows that it remains disputed whether Ace acknowledged that its washers were the ones GET alleged to be defective.

Ace raises the theory that the washers may have, in fact, been manufactured by its predecessor supplier to Optimas, Andre Armor. (Dkt. 50 at 6). Ace alleges additional facts that could support this inference. A GET corporate representative testified that "bins" of washers at GET were not completely emptied before they were refilled. Bins could, therefore, contain washers made by different manufacturers if the supplier switched manufacturers and supplied new washers before the bin had been cleared of washers made by a previous manufacturer. (Dkt. 49-12 at 75:15–

78:2). Another GET corporate representative testified that he was unsure whether any Andre Armor washers remained in the building, and that he could not tell from looking at the defective washers whether they were made by one or more different manufacturers. (Dkt. 54 ¶ 20; Dkt. 49-3 at 34:4–15). And an Optimas employee testified that when he went to GET's facility to investigate the defects, he noticed that there were still some Andre Armor washers in bins. (Dkt. 54 at ¶ 22). Although other witnesses testified that it was possible to visually distinguish washers by manufacturers (Dkt. 54 ¶ 20), Ace has established that there is dispute of fact as to this issue. Optimas has failed to establish that Ace has already admitted that its washers were defective.

In sum, at trial, Plaintiffs must establish, and Ace is permitted to contest, the merits of the underlying settlement, specifically: (1) whether Ace is liable under the indemnity agreement; (2) whether Optimas "was responding to a reasonable anticipation of personal liability rather than acting as a mere volunteer;" and (3) "[t]he reasonableness of the amounts paid in settlement". *St. Paul Fire & Marine Ins. Co. v. Michelin Tire Corp.*, 298 N.E.2d 289, 292 (Ill. App. Ct. 1973). As previously described, all three are genuinely in dispute. As to liability, per the indemnification provision, Ace is liable for an allegation arising from the use of Ace's products. Although there is evidence that GET alleged that damages arose from defective Ace washers, (Dkt. 43:14–44:14), at the time GET made its formal demand, it attributed the defects only to Optimas and not to Ace. (Dkt. 49 ¶ 68). As to whether there was a reasonable anticipation of liability, the pleadings contain multiple disputes as to

whether the washers were, in fact, defective. (*See, e.g.*, Dkt. 54 ¶¶ 28, 30,32). And as to the reasonableness of the settlement, Optimas bases its belief in reasonableness on the fact that GET had put limits on the demand, but Ace has disputed whether GET had actually put in place such limits. (Dkt. 49 at ¶ 72).

## **CONCLUSION**

Genuine disputes of fact remain that prevent this Court from granting summary judgment. Plaintiffs' Motion for Summary Judgment is therefore denied. Trial will proceed on Counts I–III for breach of warranty, duty to indemnify, and negligence, respectively. This Court has determined that the indemnification provision in Optimas's terms and conditions is effective and that Ace's remedy limitation provided on its packing slips did not modify the parties' contract. The parties are not permitted to raise this issue again at trial. But Plaintiffs have not established that Ace refused to indemnify Optimas on a claim tendered to it. Barring a showing at trial establishing that such a refusal occurred, Plaintiffs will be required to prove the validity of the underlying settlement, specifically: (1) whether Ace is liable under the indemnity provision, i.e. whether GET alleged that the defects were due to Ace washers; (2) whether Optimas was responding to a reasonable anticipation of liability; and (3) whether the settlement amount was reasonable.

_____
Virginia M. Kendall
United States District Judge

Date: September 24, 2019