IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ILLINOIS NATIONAL INSURANCE CO., et al., | ) ) ) |
| *Plaintiffs,* | ) ) No. 17 C 7567 |
| v. | ) ) Judge Virginia M. Kendall |
| ACE STAMPING AND MACHINE CO. INC., | ) ) ) |
| *Defendant.* | ) ) |

## MEMORANDUM OPINION AND ORDER

General Electric Transportation ("GET") manufactures locomotive engines and uses various washers in those engines. In 2015–16, GET retained Optimas OE Solutions, LLC ("Optimas") to source washers from outside vendors to use in its engines. When GET began manufacturing the engines, the washers cracked and, upon inspection, GET determined that the washers were not flat and were brittle. As a result, GET dissembled the locomotive engines and rebuilt them with different washers incurring approximately $1.7 million in losses. GET made a demand to Optimas, the supplier of the washers, for the loss. Optimas had contracted with manufacturer Ace Stamping and Machine Co. Inc. ("Ace") to provide the washers to Optimas's customers. When GET complained about the defective washers, Optimas settled with GET and the Plaintiff-Insurers reimbursed it for that settlement.

This Court denied Plaintiffs' Motion for Summary Judgement on September 24, 2019. (Dkt. 58). The parties reported that depositions of Plaintiffs' and

Defendant's 26(a)(2)(B) witnesses were complete as of the May 14, 2020, Joint Written Status Report. (Dkt. 72 ¶ a). Defendant now moves to bar the testimony of Terrence Carbonara, Plaintiffs' 26(a)(2)(B) expert witness. The motion is denied in part and granted in part.

## DISCUSSION

Plaintiffs retained Terrence Carbonara to offer expert testimony regarding the two types of washers at issue in this litigation—washer types 41B537660P11 ("P11") and 41B537660P16 ("P16"). (Dkt. 79-3 at 2). Specifically, Carbonara offered six opinions in his January 2, 2020, expert report (the "Carbonara Report"):

1. The P11 Washers and P16 Washers supplied by Ace and quarantined since 2016 did not satisfy flatness specifications mandated by GET;

2. Ace failed to properly test the P11 Washers and P16 Washers pursuant to the method expressly required by GET;

3. The P11 Washers and P16 Washers supplied by Ace (and quarantined by Optimas) did not satisfy hardness specifications mandated by GET;

4. Ace failed to manufacture the P16 Washers consistent with the approved production part approval process;

5. GET made a reasonable and correct decision to immediately isolate and replace all washers installed on any products manufactured while Ace supplied the P16 Washers because Ace tainted the supply chain by providing P16 Washers that exceeded the flatness and hardness specifications; and

6. The failure to manufacture P11 Washers and P16 Washers pursuant to GET's specifications could reasonably cause such washers to crack during assembly, as reported by GET.

(Dkt. 79-3 at 2–3). Ace argues that Carbonara's testimony should be barred both because he failed to identify expertise which would render him competent to offer

these opinions and because the methodology Carbonara applied to arrive at his opinions was inadequate. (Dkt. 79 at 1).

Plaintiffs attached an affidavit from Carbonara (the "Carbonara Affidavit"), to their response filed August 27, 2020. (Dkt. 85-1). The Carbonara Affidavit contains additional details regarding Carbonara's relevant background and experience and how these were necessary to arrive at the opinions contained within the Carbonara Report. On reply, Ace argues that this court must disregard the Carbonara Affidavit as an impermissible late disclosure. (Dkt. 87 at 2). Although Ace did not fully brief this argument, this court presumes Ace claims the Carbonara Affidavit violates Rule 26(e)(1) of the Federal Rules of Civil Procedure which governs supplementing disclosures under Rule 26(a). Before addressing the broader question of whether to bar Carbonara's testimony, this court first examines whether it may consider the Carbonara Affidavit.

### A. The Carbonara Affidavit

Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that, if a party fails to provide information as required by Rule 26(a) or (e), that party "is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or harmless . . ." Fed. R. Civ. P. 37(c)(1). In deciding whether to impose such sanctions under Rule 37(c)(1), the Court determines: (1) whether a violation of Rule 26(a) or Rule 26(e) occurred; (2) whether the violation was substantially justified or harmless; and (3) if a violation is found, an appropriate sanction. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 856–58 (7th Cir. 2003); *see*

*also, e.g., Doe 1 v. City of Chicago*, No. 18-cv-3054, 2019 WL 5290899, at *2 (N.D. Ill. Oct. 18, 2019) (internal citations omitted).

Parties who have made a disclosure under Rule 26(a) are obligated to supplement their disclosure if "the party learns that in some material respect the disclosure or response is incomplete or incorrect . . ." Fed. R. Civ. P. 26(e)(1)(A); *see also e.g., Noffsinger v. Valspar Corp.*, No. 09 C 916, 2012 WL 5948929, at *2 (N.D. Ill. Nov. 27, 2012) ("Supplementation, when required by Rule 26(e), is a *duty* . . .") (emphasis in original); *Wilson v. Sundstrand Corp.*, Nos. 99 C 6944, 99 C 6946, 2003 WL 22012673, at *7 (N.D. Ill. Aug. 25, 2003). In its present motion, Ace argues in part that the Carbonara Report's failure identify Carbonara's field of expertise, to "show how he is qualified to give opinions on metallurgy, product testing, washer stamping, or application of ASTM or ASME standards," and to identify the laboratory at which the hardness and flatness testing was performed and the technicians who performed them are grounds to exclude Carbonara's testimony. (Dkt. 79 at 7–8). The Carbonara Affidavit addresses these and other concerns Ace raises and supplements the Carbonara Report by offering additional information regarding Carbonara's training, professional background, and experience and the identity of both the laboratory and technicians. (Dkt. 85-1 ¶¶ 1–9, 16–17). The Carbonara Affidavit is fairly characterized as a supplemental disclosure.

Supplemental disclosures must be submitted by the time pretrial disclosures are due. *See, e.g., Ballard v. Zimmer, Inc.*, No. 11 C 6786, 2015 WL 110146, at *6 (N.D. Ill. Jan. 7, 2015) (citing Fed. R. Civ. P. 26(a)(3)(B)). Unless the court orders

otherwise, pretrial disclosures are due "at least 30 days before trial." Fed. R. Civ. P. 26(a)(3)(B). The Carbonara Affidavit was filed on August 27, 2020, more than five weeks before this case's October 5, 2020, trial and was, therefore, timely. (Dkt. 89). As this court finds no violation of Rule 26, the Rule 37(c)(1) inquiry is concluded. In deciding Ace's Motion to Bar Carbonara's testimony, this court will consider both the Carbonara Report and the Carbonara Affidavit.

### B.  Admissibility of Carbonara's Testimony

"The admissibility of expert testimony is governed by the Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999) (extending application of *Daubert* factors to engineers and other non-scientific experts). Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert*, 509 U.S. at 589; *see also C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the following conditions are satisfied:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> 
> (b) the testimony is based on sufficient facts or data;
> 
> (c) the testimony is the product of reliable principles and methods; and
> 
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, "the key to the gate is not the ultimate correctness of the expert's conclusions . . ., it is the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). In evaluating the expert's proposed testimony, the Court should "scrutinize proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (internal quotation marks omitted).

Pursuant to the *Daubert* framework, the Court must determine: (1) "whether the witness is qualified"; (2) "whether the expert's methodology is scientifically reliable"; and (3) "whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted); *see also Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). The expert's proponent bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *See Gopalratnam*, 877 F.3d at 782; *see also* Fed. R. Evid. 702 Advisory Committee's note to 2000 amendment.

### 1. Opinion No. 1: Ace Compliance with Flatness Specifications

Carbonara opines that the "P11 Washers and P16 Washers supplied by Ace and quarantined since 2016 did not satisfy flatness specifications mandated by GET." (Dkt. 79-3 at 2). At the outset, this opinion is relevant in that it speaks to the existence of a defect in the P11 and P16 washers. Ace does not challenge the

relevance of the opinion but challenges Carbonara's qualifications to offer it as an expert. (Dkt. 79 at 7). The Carbonara Affidavit fleshes out the admittedly spare details offered in the CV attached to the Carbonara Report regarding Carbonara's qualifications. Specifically, Carbonara's degree in Production Management featured quality assurance methodologies. (Dkt. 85-1 ¶ 1). Carbonara claims over three decades of professional experience both conducting and overseeing flatness testing of washers to determine whether they complied with required specifications, including under the ASME Y14.5 standard. (Dkt. 85-1 ¶¶ 2, 4–6, 8). Carbonara also is experienced reviewing customer blueprints and specifications for washers. (Dkt. 85-1 ¶¶ 4–9). The Court finds Carbonara qualified to offer testimony as to the flatness of the P11 and P16 washers. Any limitations regarding his experience can be addressed through cross-examination.

To evaluate the flatness of the P11 and P16 washers in question, Carbonara analyzed the GET blueprints to determine the appropriate standard and identified the ASME Y14.5 as the required flatness testing methodology. (Dkt. 85-1 ¶¶ 11, 13). Twenty-four P11 washers and thirty-six P16 washers were randomly selected for testing and Carbonara directed and supervised Raul Bermudes, an Optimas Manufacturing Quality Engineer, on testing the washers under the ASME Y14.5 standard at an Optimas testing laboratory. (Dkt. 79-3 at 13–14, 28; Dkt. 85-1 ¶¶ 15–17). Carbonara reviewed both the flatness testing results (Dkt. 79-3 at 28; Dkt. 85-1 ¶ 18) and Ace's 2016 8D corrective action reports (Dkt. 79-3 at 15) to conclude that the P11 and P16 washers did not meet GET's flatness specifications. Ace challenges

the reliability of Carbonara's methodology in testing the P11 and P16 washers' flatness because Carbonara did not perform the tests himself and, instead, "look[ed] at a chart of numbers that someone else complied for measurements." (Dkt. 79 at 7). Expert opinions may be based on "review of experimental . . . data generated by others in the field." *Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999) (quoting *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996)); *see also Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1119 (N.D. Ill. 2005). Bermudes and Carbonara are both active in the field of quality management and assurance. (Dkt. 85-1 ¶¶ 2, 16). Moreover, there is no indication that Bermudes exercised discretion in the design or implementation of the flatness testing. (Dkt. 85-1 ¶ 16). Carbonara asserts it is "industry practice for quality managers and those overseeing quality assurance to rely upon . . . flatness testing performed by properly qualified technicians . . . when forming opinions on whether fasteners comply with customer specifications" and the Court sees no basis to contest this claim. (Dkt. 85-1 ¶ 18). Therefore, Carbonara possesses the necessary expertise and applied a sufficiently sound methodology to offer expert opinions on whether Ace complied with GET's flatness specifications.

      2. *Opinion No. 2: Ace Compliance with Testing Methodology*

Carbonara opines that "Ace failed to properly test the P11 Washers and P16 Washers pursuant to the method expressly required by GET," specifically that Ace used an improper method of testing the washers' flatness. (Dkt. 79-3 at 2). Although Ace does not expressly challenge Carbonara's expertise to offer this opinion, the Court

determines that he is so qualified. In addition to experience and training previously mentioned, Carbonara has thirty years' experience reading and interpreting blueprints and production part approval processes ("PPAPs") and identifying customer-specified testing procedures. (Dkt. 85-1 ¶¶ 2–9). This background both qualifies Carbonara to offer an expert opinion on whether Ace's testing methodology complied with GET's requirements and will aid lay jurors interpreting and understanding blueprints, PPAPs, and technical testing procedures.

Instead, Ace argues that Carbonara's opinion should be barred because the underlying methodology is flawed. (Dkt. 79 at 10). To support its position, Ace points out that the relevant PPAPs state "a feeler gauge was going to be used to measure flatness" instead of the Micro-Vu Carbonara maintains is required by GET specifications. (Dkt. 79 at 10). Essentially, Ace argues that Carbonara's conclusion is incorrect. Whether Carbonara's conclusion is or is not correct is appropriately left to the trier of fact and is not a basis to find his methodology lacking. *See Gopalratnam*, 877 F.3d at 780 ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weight these sources of doubt."); *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Daubert*, 509 U.S. at 589) ("It is not the trial court's role to decide whether an expert's opinion is correct."). Regardless of the ultimate correctness of Carbonara's conclusion, his methodology is sound. In forming his opinion, Carbonara analyzed GET's blueprints for the P11 and P16 washers, reviewed Ace's PPAP and the supporting Control Plan documentation,

reviewed Ace's March 2016 8D corrective action, and reviewed the deposition testimony of James Haarsma. (Dkt. 79-3 at 17–19). Carbonara's approach is a reasonable basis from which to form an opinion. Indeed, it appears to be the same methodology applied by Ace in questioning Carbonara's conclusion. (Dkt. 79 at 10). Because Carbonara possesses the requisite expertise and his methodology is sound, his opinion regarding Ace's compliance with the testing methodology required by GET is admissible.

*3. Opinion No. 3: Ace Compliance with Hardness Specifications*

Similar to Carbonara's opinion with respect to the washers' flatness, Ace challenges Carbonara's opinion that Ace failed to provide P11 and P16 washers that satisfied GET's hardness specifications. (Dkt. 79 at 7). This opinion is relevant in that it speaks to the existence of a defect in the P11 and P16 washers. Ace argues that Carbonara does not possess the expert qualifications necessary to give such an opinion and that his methodology was flawed because, instead of performing the hardness tests himself, he merely regurgitated the results of tests conducted by others. (Dkt. 79 at 7). The Court finds Carbonara qualified to give an expert opinion on whether the P11 and P16 washers provided by Ace met GET's hardness specifications. Carbonara's formal education focused on quality assurance methodologies. (Dkt. 85-1 ¶ 1). In addition to previously working as a certified lab technician who "routinely conducted . . . hardness testing on washers to determine whether they complied with necessary specifications," Carbonara has significant experience overseeing quality assurance labs and hardness testing on washers using

the testing standards at issue, namely the "Rockwell Hardness Tester pursuant to the ASTM Standard Test Methods." (Dkt. 85-1 ¶¶ 2, 4–9). Finally, Carbonara has experience reviewing customer blueprints and hardness specifications for washers. (Dkt. 85-1 ¶¶ 4–9).

Ace's challenge to Carbonara's methodology with respect to evaluating compliance with GET's hardness specifications is similarly unavailing. Carbonara reviewed the GET blueprints to identify the required hardness standard and testing methodology for P11 and P16 washers. (Dkt. 85-1 ¶ 11). Next, Carbonara reviewed the required hardness testing methodology: ASTM F436 Standard Specification for Hardened Steel Washers; ASTM F606 Standard Test Methods for Determining the Mechanical Properties of Externally and Internally Threaded Fasteners, Washers, Direct Tension Indicators, and Rivets; and ASTM E18 Standard Test Methods for Rockwell Hardness of Metallic Materials. (Dkt. 79-3 at 10; Dkt. 85-1 ¶ 13). Carbonara directed and supervised the hardness testing of eight randomly sampled P11 and nine randomly sampled P16 washers conducted by Thurlow "Buddy" Martin, an Optimas Quality Control Technician at an Optimas testing laboratory. (Dkt. 79-3 at 10, 28; Dkt. 85-1 ¶ 16–17). In forming his opinion, Carbonara reviewed the test results (Dkt. 79-3 at 28; Dkt. 85-1 ¶ 18), Ace's 2016 8D reports (Dkt. 79-3 at 12), and reviewed the deposition transcript of Adam Roberts, the GET Supplier Quality Manager (Dkt. 79-3 at 13).

Contrary to Ace's contention that, to form an opinion, Carbonara must perform the tests himself, expert opinions may be based on "review of experimental . . . data

generated by others in the field." *Clark*, 192 F.3d at 758 (quoting *Cummins*, 93 F.3d at 368); *see also Loeffel*, 372 F. Supp. 2d at 1119. Martin and Carbonara are both active in the field of quality management and assurance. (Dkt. 85-1 ¶¶ 2, 16). Moreover, there is no indication that Martin exercised discretion in the design or implementation of the hardness testing. (Dkt. 85-1 ¶ 16). Carbonara reports that it is "industry practice" to rely upon hardness testing performed by "properly qualified technicians . . . when forming opinions on whether fasteners comply with customer specifications" and the Court is aware of no basis to doubt this assertion. (Dkt. 85-1 ¶ 18). Carbonara possesses the necessary expertise and applied a sufficiently sound methodology to offer expert opinions on whether Ace complied with GET's hardness specifications.

*4. Opinion No. 4: Ace's Compliance with the PPAP*

Carbonara opines that Ace failed to manufacture P16 washers consistent with the approved PPAP. (Dkt. 79-3 at 17). Specifically, Carbonara states that Ace's use of FPM, an unapproved heat treater for the P16 washers, constituted a violation of the relevant PPAP. (Dkt. 79-3 at 17). Carbonara's decades of professional experience creating, reviewing, submitting, and interpreting PPAPs renders him an expert competent to offer opinion testimony as to Ace's compliance with the PPAPs. (Dkt. 85-1 ¶¶ 3–9). Carbonara's review of Ace's PPAP submission for the P16 washers is a sound methodological basis to support his opinion. (Dkt. 79-3 at 17). Ace's contention that the "alleged change in the heat treater being a violation of the PPAP is easily seen" such that a jury would not benefit from Carbonara's testimony fails to recognize

that PPAPs are technical, complex, and specialized documents a lay juror is unlikely to have encountered or interpret with ease. Plaintiffs retained Carbonara to explain and interpret the PPAPs which is likely to aid the jury in understanding key issues involved in the case. Carbonara possesses the expertise to testify about Ace's compliance with the PPAPs, the methodology underpinning his opinions is sound, and that testimony is relevant because it will "assist the trier of fact to understand evidence or to determine a fact in issue." Fed. R. Evid. 702.

Next is Carbonara's related opinion that Ace's failure to comply with the P16 approved PPAP was "one of the most significant contributing factors to the heat treating nonconformance." (Dkt. 79-3 at 17). Ace correctly points out that Carbonara offers no explanation as to why using FMP to heat treat the P16 washers necessarily led to the observed nonconformances. (Dkt. 79 at 9; Dkt. 87 at 4). It is not at all apparent that FPM caused the hardness nonconformances observed in the P16 washers simply because it was an unapproved heat treater. FPM *was* an approved heat treater for the P11 washers, and 100% of the tested P11 washers nonetheless yielded hardness nonconformances. (Dkt. 79-3 at 17, 28). With no explanation as to how Carbonara arrived at his opinion, the methodology underpinning his conclusion is not sound. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("Rule 702 does require, however, that the expert explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line.'") (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)). Because the method

is not sound, Carbonara's opinion that Ace's failure to comply with the P16 approved PPAP caused the observed heat treating nonconformance is inadmissible.

### 5. *Opinion No. 5: Reasonableness of GET's Remediation Plan*

Carbonara is qualified to testify as an expert that GET's decision to isolate and replace all washers installed during the period Ace supplied P16 washers was reasonable and correct. (Dkt. ¶ 79-3 at 3). Carbonara has several decades of experience determining potential failure rates and the impact of noncompliant washers on final products and assessing how to "reasonably remedy" any related issues. (Dkt. 85-1 ¶¶ 8–9). Relevantly, in 2003, Carbonara assisted General Motors in investigating nonconforming washers and advised on a reasonable remediation plan. (Dkt. 85-1 ¶ 19).

Ace challenges Carbonara's testimony as to the reasonableness of GET's remediation plan first by claiming it "usurps the jury's role." (Dkt. 79 at 9). The risks posed by, and industry practices in response to, defective washers are specialized areas of technical practice that lay jurors are unlikely to possess. In essence, Carbonara's testimony is that, in the context of his many years' experience in the industry dealing with similar issues, GET's response was reasonable. While the jury may enjoy the benefit of Carbonara's opinion of GET's remediation plan based on his significant direct experience, the jury is still free to determine whether they consider Carbonara's assessment correct or credible. *See Gopalratnam*, 877 F.3d at 780; Smith, 215 F.3d at 719.

Next Ace questions the methodology supporting Carbonara's opinion and criticizes it for not being based in "math or science principles." (Dkt. 87 at 4). Rule 702 does limit testimony solely to that based on the application of technical or scientific expertise; instead, the rule "specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Trs. of the Chi. Painters & Decorators Pension, Health & Welfare, and Deferred Savings Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007); *see also Kumho*, 526 U.S. at 156 ("[A]n expert might draw a conclusion from a set of observations based on extensive and specialized experience."). In arriving at his conclusion, Carbonara applies his prior experience formulating and evaluating remediation plans in response to defective washers to his knowledge of the specific nonconformances observed in the P11 and P16 washers and GET's remediation plan. This methodology is sound. Carbonara's testimony regarding the reasonableness of GET's remediation plan is admissible.

    *6. Opinion No. 6: Impact of Noncompliant Washers*

Carbonara concludes that Ace's failure to manufacture P11 and P16 washers to GET specifications could cause the washers to crack during assembly. (Dkt. 79-3 at 3). While Ace first challenges Carbonara's qualifications to testify on the subject, the background in both failure analysis and metallurgy described in the Carbonara Affidavit is sufficient to establish Carbonara as an expert. (Dkt. 85-1 ¶ 8, 19–20). In addition to Carbonara's specific experience dealing with metallurgy and failure analysis is his multi-decade background working in quality assurance and

assessment for washers. (Dkt. 85-1 ¶¶ 2–9). In addition, Carbonara's testimony as to the likely impact of defective P11 and P16 washers is relevant to several key issues in the case.

Ace further argues that Carbonara's methodology is insufficient because he never performed any dynamic or static load testing of the washers, never witnessed a washer break firsthand, never specified how much force was necessary to crack the washers, and did not discuss how much force the washers would experience when installed by GET. (Dkt. 79 at 8–9). Here, these arguments are unavailing. Although Carbonara himself never saw a washer crack, he reviewed reports generated by GET of washers breaking post-installation. (Dkt. 79-3 at 15). Experts are not required to "personally perceive the subject of [their] analysis." *Loeffel*, 372 F. Supp. 2d at 1119 (quoting *NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 790 (7th Cir. 2000)). Neither is Carbonara required to conduct dynamic or static load testing himself as he reviewed the corporate representative deposition transcript of others, including Roberts, who did discuss the results of such testing. (Dkt. 79-4 at 14–15; 85-1 ¶ 19). In addition, Carbonara reviewed Ace's 8D reports when forming his opinion. (Dkt. 85-1 ¶ 19). Finally, Carbonara described the effect of both out-of-specification flatness on stress distribution across washers and out-of-specification hardness on the washers' susceptibility to cracking under compression forces in great detail. (Dkt. 79-3 ¶ 15). This approach is sufficiently sound for Carbonara to opine on the result of a failure to manufacture P11 and P16 washers to GET's specifications. Carbonara's testimony on this point is admissible.

## **CONCLUSION**

For the foregoing reasons, Ace's motion to bar Terrence Carbonara as an expert witness is granted in part and denied in part.

_____
Virginia M. Kendall
United States District Judge

Date: September 17, 2020